UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN HAMMOND,

               Plaintiff,

v.

LAPEER COUNTY, JAMES CUMMINGS,
and DALE ENGELHARDT, in their
individual and official capacities,

               Defendants.

_____/

Case No. 13-15010

Paul D. Borman
United States District Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 20)

Before the Court is Defendants Lapeer County, James Cummings and Dale Engelhardt's Motion for Summary Judgment. (ECF No. 20.) Plaintiff filed a Response (ECF No. 24) and Defendants filed a Reply (ECF No. 26). The Court held a hearing on June 19, 2015. On July 30, 2015, the Court ordered the parties to submit supplemental briefing addressing the appropriate constitutional standard for analyzing Plaintiff's excessive force claims in this case. Defendants filed their supplemental brief on July 30, 2015 (ECF No. 29) and Plaintiff filed two supplemental briefs, one on July 30, 2015 and a second supplemental brief on August 14, 2015 (ECF No. 31). For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

**INTRODUCTION**

This action involves Plaintiff's claim that deputies applied excessively tight handcuffs, which they refused to loosen, and used excessive force when escorting him to and placing him in a holding cell, after he was held in contempt of court, sentenced and remanded to custody, following a

1

December 12, 2011, Friend of the Court Bench Warrant Arraignment in Lapeer County Circuit Court, on three separate child support arrearages. The individual deputies and the County now move for summary judgment. Because genuine issues of material fact remain as to Plaintiff's excessive force and assault and battery claims, the Court DENIES the individual Defendants' motion for summary judgment. Because there is no evidence that the County had notice of similar constitutional violations that the County ignored, the Court GRANTS the County's motion for summary judgment.

## I.    BACKGROUND

On December 12, 2011, Plaintiff was arraigned before Judge Justus C. Scott, Family Court Judge of the Lapeer County Circuit Court, on a Friend of the Court Bench Warrant. (Defs.' Mot. Ex. 1, Transcript of December 12, 2011 Proceedings, hereinafter "12/12/11 Tr.")   Judge Scott found Plaintiff in contempt of court on each of three separate child support arrearages, ordered Plaintiff to pay on two of the three arrearages, sentenced him to thirty days in jail and remanded him immediately to the custody of the jail. *Id.*

### A.    Testimony of Ms. Potter-Knowlton

The case worker assigned to Plaintiff's cases, Beth Potter-Knowlton, met with Plaintiff before the arraignment to determine if any arrangements could be made on his arrearages. (Defs.' Mot. Ex. 2, October 29, 2014 Deposition of Beth Potter-Knowlton 18.)   Ms. Potter-Knowlton testified that she was unable to make any headway with Plaintiff and that, by the time they appeared before Judge Scott, Plaintiff was "a little bit agitated." *Id.* at 22.   She testified that Plaintiff was "curt" with Judge Scott and had "a bit of an attitude."   Ms. Potter-Knowlton thought Plaintiff was unhappy that a complainant in one of the child support matters was present in the courtroom. *Id.*

2

According to Ms. Potter-Knowlton, after Judge Scott ruled and ordered Plaintiff detained, Plaintiff made "some statements," the exact content of which she could not recall, to the complainant in the audience. *Id*. at 24.

Ms. Potter-Knowlton accompanied Plaintiff out of the courtroom and placed him in a holding cell outside the courtroom and asked for officer assistance to help her get Plaintiff down to lock up. *Id*. at 25. Typically, if there is "no issue" with the individual who has been ordered detained, they would sit in a chair in the courtroom while Ms. Potter-Knowlton had the order signed by the judge and then she would "do a quick pat down" and take them down the elevator to the lock up for processing. *Id*. at 27-28. If there "is a problem for some reason," Ms. Potter-Knowlton places the individual in a holding cell and calls for assistance. On this particular day, because of Plaintiff's "agitated demeanor," she placed him in the holding cell and called for assistance to take him down the elevator to lockup. *Id*. at 28. Ms. Potter-Knowlton could not recall what exact behaviors Plaintiff had exhibited that made her call for assistance that day but noted that she had been "doing this a long time," and had a "gut feeling" that Plaintiff needed to "cool off" and she was not comfortable with him "being without handcuffs" and taking him down the elevator by herself. *Id*. 29-30.

Eventually, Deputy James Cummings arrived to assist in taking Plaintiff down the elevator. *Id*. at 32-33. When Cummings arrived, Plaintiff was in the holding cell talking on his cell phone and ignored Cummings' request that he get off the phone. *Id*. at 33. Ms. Potter-Knowlton recalled that Plaintiff ignored somewhere between three and five of Cummings' requests to get off of his phone. *Id*. at 33-34. At some point, out of Ms. Potter-Knowlton's sight, Cummings placed Plaintiff in handcuffs. *Id*. at 36-37. Ms. Potter-Knowlton does not recall Plaintiff complaining about the

3

tightness of the handcuffs. *Id*. at 37.

After Plaintiff was handcuffed, Cummings escorted Plaintiff to the elevator and Ms. Potter-Knowlton operated the elevator, which required a key to be inserted before a floor could be pushed. *Id*. at 34. Cummings instructed Plaintiff to get in the elevator facing the rear of the elevator and Plaintiff was twisting from the waist up and resisting Cummings' instructions and asking why he was being made to do this. *Id*. at 47. Ms. Potter-Knowlton first accidentally pushed the button for the wrong floor and the three of them had to remain on the elevator as it proceeded to the incorrect floor before she could re-insert the key and activate the appropriate floor button. *Id*. at 40-41. Throughout this time period, Plaintiff continued to look back and ask why he was being instructed to put his face to the rear of the elevator. *Id*. at 47. Ultimately a "scuffle" ensued between Cummings and the Plaintiff and Plaintiff eventually ended up on his knees in the elevator. *Id*. at 48. At some point, Cummings made reference to using his taser if Plaintiff did not stop "thrashing." *Id*. at 49. Ms. Potter-Knowlton was "nervous" during this scuffle on the elevator, that she could have been banged or hit by Cummings or the Plaintiff but does not recall Plaintiff threatening her directly in any way. *Id*. 49-50. When the door opened on the basement floor at the lock up area, there was another officer waiting to assist Cummings with getting Plaintiff off the elevator, so Ms. Potter-Knowlton went back up the elevator to complete her paperwork. *Id*. at 51. She remembers generally indicating, once she was back at her office, that there had been an incident on the elevator. *Id*. at 51.

### B. Testimony of Officer Cummings

Officer Cummings recalls that on December 12, 2011, he was called by Sergeant Engelhardt, who had been called by Judge Scott's courtroom clerk, to report to the holding cell area outside the

4

courtroom to help take the Plaintiff into custody.  (Defs.' Mot. Ex. 4, October 14, 2014 Deposition

of James Cummings 13.)  Cummings testified that Plaintiff was in a holding cell when Cummings

first encountered him, and was talking on his cell phone.  *Id*. at 14.  Plaintiff appeared agitated while

talking on the phone and was yelling at Cummings who was ordering Plaintiff to get off the phone.

*Id*. at 14-15.  Plaintiff refused three or four verbal commands from Cummings to get off the phone

after which Cummings opened the holding cell door and explained that Plaintiff had been remanded

to custody and to hang up the phone.  Plaintiff then hung up the phone, shoved it in his pocket and

"assumed a fighting stance" and "doubled up his fists" and stared at Cummings.  *Id*. at 16.  After

maybe a minute, Plaintiff followed Cummings' order to turn around and place his hands on the wall

so that he could place him in handcuffs.  Cummings then handcuffed him behind his back and

explained that they were going to go get on the elevator.  *Id*. at 18-19.  At this point, Cummings was

not able to check the handcuffs for tightness or double lock them (which prevents them from

tightening on themselves, *id*. at 22-23) because Plaintiff was still being "aggressive," and starting

to "tense up" and "not wanting to go with" Cummings.  *Id*. at 21.  Plaintiff was arguing with

Cummings about why he had to go downstairs.  *Id*. at 22.  Cummings was not able to check the

handcuffs for tightness, by placing his finger between the handcuffs and Plaintiff's wrist, until they

arrived downstairs in the lockup.  *Id*.  at 23.  Cummings testified that Plaintiff never complained that

he was in pain or that his handcuffs were too tight.  *Id*. at 23-24.

      After Cummings got Plaintiff out of the holding cell to walk to the elevator, Plaintiff once

again turned to face Cummings and Cummings just turned him back around, held both of his arms

and walked him toward the elevator where Ms. Potter-Knowlton was waiting with the elevator key.

*Id*. at 25. During the two or so minutes that the three of them waited for the elevator, Plaintiff was

5

a little "lippy" with Cummings but not physically resisting.  *Id*. at 26.  When they got on the elevator, Cummings told Plaintiff to face the back of the elevator and Plaintiff was "hollering" at Cummings, questioning why he had to face the back of the elevator.  *Id*. at 26-27.  Plaintiff complied but once the elevator started moving, Plaintiff suddenly tried to spin around and wanted to argue with Cummings and Ms. Potter-Knowlton about why he was in custody and why he had to go to jail. *Id*. at 27-28.  Cummings turned Plaintiff back to face the wall of elevator but Plaintiff spun around again, which Cummings interpreted as an effort to go for Ms. Potter-Knowlton.  Cummings got a hold of Plaintiff's shirt from the back and got Plaintiff into the corner and he spun around again, at which time Cummings put his foot into the back of Plaintiff's calf and forced Plaintiff into a kneeling position.  *Id*. at 30-31.  Cummings told Plaintiff to stay down on his knees, and told Plaintiff he was going to, and did, pull out his taser.  *Id*. at 32-33.  Plaintiff then stopped trying to get back up and sat on the elevator floor until the doors opened up at the basement.  *Id*. at 33. Cummings estimated that the elevator ride lasted about four minutes.  *Id*.

When the elevator arrived at the basement, they were met by Sergeant Dale Engelhardt.  *Id*. at 34.  They took Plaintiff, still handcuffed, to the holding cell where Cummings had Plaintiff get back on his knees so that he could pat him down and take his property and check his handcuffs.  *Id*. While Cummings did this, Engelhardt was talking to Plaintiff, trying to calm Plaintiff down and diffuse Plaintiff's anger over being placed in custody by Judge Scott.  *Id*. at 35.  Cummings checked Plaintiff's handcuffs and then returned to the circuit court to finish up what he had been doing when he was called to assist with Plaintiff.  *Id*. at 35-36.  When he returned to the basement lock up, Plaintiff had "calmed down," and Cummings removed the handcuffs that were on Plaintiff, which were Cummings' handcuffs, and replaced them with another set of jail cuffs.  *Id*. at 36.  Cummings

testified that Plaintiff never complained that the handcuffs were too tight or were hurting him. *Id*. Cummings then transported Plaintiff, along with the rest of the inmates, to the jail. *Id*. at 37. After the incident, Cummings testified, he caused an arrest warrant to be issued for Plaintiff for his resisting and obstructing in the elevator ride. *Id*. Plaintiff accepted guilt by pleading nolo contendere to the criminal charge of resisting arrest and later filed a Citizen Complaint against Cummings for the incident in the elevator. *Id*. at 38.[1]

### C.   Testimony of Sergeant Engelhardt

---

[1] Defendants have not attempted to rely on Plaintiff's plea as a basis to dismiss the claims against them under *Heck v. Humphrey*, 512 U.S. 477 (1994). Nor could they have successfully done so on the facts of this case. "The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant [to the *Heck* analysis] if the two are consistent with one another." *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010) (alteration added). Plaintiff testified in his deposition that he pleaded "no contest" to resisting arrest as a result of the incidents at the Lapeer County Courthouse on December 12, 2011. Hammond Dep. 27-28. However, there is no evidence in the record regarding the statute or ordinance under which Plaintiff was charged. Nor is there evidence regarding the factual basis for Plaintiff's plea – indeed there is no evidence of the plea at all other than the testimony of Cummings (a guilty plea to resisting) and Hammond (a no contest plea to resisting). There is no transcript of the plea hearing and no testimony was elicited from Plaintiff regarding the factual basis for his plea. In fact, Plaintiff denies that he ever tried to resist the officers. Hammond Dep. 43. Because there is no evidence in the record that would permit the Court to determine the factual basis for Plaintiff's plea, *i.e.* did he plead to resisting before, during or after the elevator ride, his excessive force claim would not necessarily imply the invalidity of his plea and therefore his claim would not be barred by *Heck*. *See Lucier v. City of Ecorse*, 601 F. App'x 372, 377 (6th Cir. 2015) (finding that plaintiff's claim was not barred by *Heck* where "[t]he factual basis of Plaintiff's guilty plea was never specified") (alteration added); *White v. City of Southfield*, No. 14-10557, 2015 WL 5545472, at *6-7 (E.D. Mich. Sept. 18, 2015) (finding plaintiff's claim not barred by *Heck* or principles of collateral estoppel where "plaintiff's guilty plea did not specify when he resisted"). Additionally, there could be legal significance to the nature of Plaintiff's plea if in fact it was one of "no contest." *See Miller v. Village of Pinckney*, 365 F. App'x 652 (6th Cir. 2010) (noting that plaintiff "admitted no facts" when she pled no contest to resisting and obstructing); *Shirley v. City of Eastpointe*, No. 11-14297, 2013 WL 4666890, at *7 (E.D. Mich. Aug. 30, 2013) (finding that "clear Michigan law governing pleas of no contest defeat[ed] Defendants' effort to rely on the stipulations of counsel at Plaintiff's state court plea hearing as a basis for arguing that Plaintiff is barred from "relitigating" the facts surrounding his October 2, 2009 arrest") (alteration added).

Sergeant Engelhardt initially placed the call to Cummings to go to Judge Scott's courtroom and assist with Plaintiff after Engelhardt received a call from Judge Scott's courtroom clerk requesting assistance with Plaintiff, whom she described to Engelhardt as "unruly." (Defs.' Mot. Ex. 3, October 14, 2014 Deposition of Dale Engelhardt 13-15.) Approximately 10-20 minutes after Engelhardt placed the call to Cummings, Cummings and Ms. Potter-Knowlton arrived down in the basement at lockup with Plaintiff. *Id*. at 17. Engelhardt testified that he could see on the elevator monitor down in the basement lock up area that Plaintiff was resisting Cummings in the elevator. *Id*. at 18-20. It appeared to Engelhardt that Cummings and Plaintiff were wrestling and that Cummings was trying to gain control of Plaintiff and Plaintiff was resisting him and pulling away. *Id*. at 21. The elevator door opened and Ms. Potter-Knowlton yelled "Dale" as Engelhardt came around the corner and was right there at the elevator door. *Id*. at 22. At that point, it appeared to Engelhardt that Cummings had control of Plaintiff in the escort position but Plaintiff was "visibly upset." *Id*. at 23-24. Plaintiff did not scream or try to assault anyone, and Engelhardt "verbally engaged" Plaintiff to try to de-escalate the situation and calm Plaintiff down. *Id*. at 24. Engelhardt testified that Plaintiff responded "indifferently" but never became a problem for Engelhardt. *Id*. 24-25.

Cummings and Engelhardt both escorted Plaintiff to the lockup holding cell and Cummings instructed Plaintiff to kneel so that Cummings could pat him down and retrieve his personal belongings. *Id*. at 26. Plaintiff then stood up and Cummings and Engelhardt left the holding cell and closed the door. *Id*. at 27. Cummings then left the basement but returned later to exchange Plaintiff's handcuffs when it was time for the transport to the jail. *Id*. Engelhardt thought Cummings was gone less than thirty minutes, maybe 15-20 minutes. *Id*. at 28. During this time

8

Plaintiff was not unruly and did not ever complain that his handcuffs were too tight or that he was in pain. *Id*. Engelhardt testified that if Plaintiff had complained, he would have checked Plaintiff's wrists and checked the handcuffs for tightness. *Id*. at 29.

### D.     Plaintiff's Testimony

Plaintiff admitted that he was upset the day of his appearance in court with a woman named Jennifer, the mother of one of his children, who was in the courtroom on December 12, 2011 during his arraignment. (Defs.' Mot. Ex. 13, October 14, 2014 Deposition of Stephen Hammond 13.) He was upset with Jennifer because she gave a statement that Plaintiff should not be permitted to walk the streets because he failed to pay child support. *Id*. at 14. Plaintiff testified that he was in the holding cell outside the courtroom for about 10 minutes and that he still had his wallet, keys and phone. *Id*. He testified that he made a call to "Jina" while he was in the holding cell asking her to pay the $800 bail to get him out of jail. *Id*. at 14-15. Plaintiff admitted that he did not immediately get off the phone when Cummings first asked him to because the signal was bad and he had to keep repeating the amount of his bail to Jina. *Id*. at 16.

Plaintiff denies that he struck a fighting posture when Cummings first entered the holding cell and testified that he fully cooperated with Cummings' efforts to place the handcuffs on him. *Id*. at 17. Plaintiff testified that he immediately told Cummings that the handcuffs were too tight and that Cummings "did nothing" and said "they'll be ok." *Id*. at 17, 35. Plaintiff had been in the jail before and had never had a problem with any of the deputies before this incident. *Id*. at 18-19. Plaintiff states that Cummings was pulling Plaintiff around by the hood of his sweatshirt and directing him with the hood of his sweatshirt into the elevator. *Id*. at 19. Plaintiff testified that once they were in the elevator, Cummings "shoved" him into the back of the elevator and then tried to

"throw [Plaintiff] on the floor." *Id*. at 20, 36, 39.  Plaintiff asked Cummings why he was throwing Plaintiff around and that is when Cummings pulled out his taser. *Id*. at 20-21.  Plaintiff was kneeling at the time and Cummings kept the taser pressed into Plaintiff's neck but never discharged the taser. *Id*. at 21.

Plaintiff states that when the elevator doors opened on the basement floor, Engelhardt was there and they took Plaintiff to his cell.  *Id*. at 22.  Plaintiff told Engelhardt and Cummings that the handcuffs were tight on him and neither one did anything about it.  *Id*.  They left him in the cell for "probably 45 minutes," before they both came back in, took his personal property, removed the handcuffs from behind his back and put handcuffs back on in front of his body.  *Id*. at 22-23.

Plaintiff was transported to the jail and, within five minutes of his arrival at the jail and before he was booked, he complained to an officer, whom he could not identify, that his handcuffs had been too tight.  *Id*. at 24.  Upon his arrival at the jail, Plaintiff was initially processed, searched and printed by Deputy Brandon Jones and subsequently booked by Sergeant Theresa Davis.  (Defs.' Mot. Ex. 5, October 29, 2014 Deposition of Brandon Jones 19-20.)  After he paid the fine and was released, Plaintiff returned to the front of the jail to file a citizens complaint against Cummings, at which time someone took photographs of his wrists, which were "swelled up and really red," but not cut or scraped. Hammond Dep. 24-25, 41. The following Monday, Plaintiff sought medical treatment for his wrists.  *Id*. at 25.  Plaintiff testified that he complained at least three times that the handcuffs were too tight.  *Id*. at 37.

Sergeant Davis took Plaintiff's Citizens Complaint against Cummings.  (Defs.' Mot. Ex. 7, October 29, 2014 Deposition of Theresa Davis 10, Ex. 1, Incident Report, Ex. 2, Citizens Complaint.)   After Plaintiff completed the paperwork, he showed Sergeant Davis his wrists.

10

Sergeant Davis testified that his wrists were red and had marks consistent with handcuffs being applied and with someone resisting and also consistent with handcuffs being applied too tightly even if there was no resistance. Davis Dep. 14-15. Sergeant Davis testified that Plaintiff also complained that his thumbs were numb and she directed Detective Sergeant Polmanteer to take photographs of Plaintiff's wrist, which Sergeant Polmanteer did. *Id.* at 15; Defs.' Mot. Ex. 11, Photographs. Sergeant Davis told Plaintiff that his Complaint would be reviewed by Lieutenant Duane Engelhardt (the brother of Sergeant Dale Engelhardt who interacted with Plaintiff in the lock up at the Lapeer County Courthouse) and that Plaintiff would be contacted about the outcome. (Davis Dep. 13-14; Davis Dep. Ex. 1, Incident Report.) On December 19, 2011, Lieutenant Engelhardt sent Plaintiff a letter explaining that his Citizens Complaint had been reviewed and that a determination had been made that Cummings used the amount of force necessary to gain compliance with Judge Scott's Order. (Defs.' Mot. Ex. 12, Dec. 19, 2011 Memorandum to Plaintiff.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at

11

323.  *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 324.  "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her

position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) ("By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.").

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "One of the principal purposes of the summary

13

judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-34.

## III.   ANALYSIS

### A.   Plaintiff's Excessive Force Claims Against the Individual Defendants

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "There is a long-standing principle that government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008). "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

14

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The question of which amendment supplies [plaintiff's] rights is not merely academic, for the standards of liability vary significantly according to which amendment applies." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)). The Sixth Circuit has summarized the range of potentially applicable constitutional amendments in an excessive force case:

> Section 1983 does not confer substantive rights; rather, it is only a means to vindicate rights already conferred by the Constitution or laws of the United States. *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Excessive force claims, however, can be raised under the Fourth, Eighth, and Fourteenth Amendments. Which amendment should be applied depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two. *Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008); *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens, *see Graham*, 490 U.S. at 388, 109 S.Ct. 1865, while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. *See Whitley v. Albers*, 475 U.S. 312, 318–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). When a citizen does not fall clearly within either category—e.g., pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force. *See Lanman*, 529 F.3d at 680–81; *Phelps*, 286 F.3d at 300.

*Burgess*, 735 F.3d at 472.

"The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that arise[ ] in the context of an arrest or investigatory stop of a free citizen, while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (internal quotation marks and

15

citations omitted) (alteration in original).  The Fourth Amendment protects an individual arrested without a warrant from acts of excessive force through the probable cause hearing, at which time the protections of the Fourteenth Amendment will apply.  "We therefore join the Ninth and Tenth Circuits in setting the dividing line between the Fourth and Fourteenth Amendment zones of protection at the probable-cause hearing." *Id*. at 867.  The Fourteenth Amendment will leave off and the Eighth Amendment protections will apply to an incarcerated individual who has been convicted and is serving his sentence.  *Id*. at 864.  "'*[T]he legal status* of the victim of the excessive force determines [which] amendment governs his excessive force claims . . . .'"  *Id*. at 866 (quoting *Gravely v. Madden*, 142 F.3d 345, 348-49 (6th Cir. 1998)) (emphasis and alteration in original).  The determination of which amendment applies, then, does not "hinge upon logistical criteria alone." *Id.* at 866.

The legal status of a victim of excessive force is, of course, significant because the conduct of the offending officer must be analyzed under the standard appropriate to the applicable constitutional provision.  "Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess*, 735 F.3d at 472.  As the Supreme Court has recently confirmed, a claim of excessive force under the Fourteenth Amendment is also analyzed under an "objective reasonableness" standard.  *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (holding that "an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment").  *See also Coley v. Lucas County, Ohio*, __F.3d__, 2015 WL 4978463, at *4 (6th Cir. 2015) ("The Supreme Court has recently clarified . . . that when assessing pretrial detainees

16

excessive force claims we must inquire into whether the plaintiff shows 'that the force purposely or knowingly used against him was objectively unreasonable.'") (quoting *Kingsley,* 135 S. Ct. at 2473) (alteration added).  In analyzing a pretrial detainee's Fourteenth Amendment claim, "[a] court must account for the 'legitimate  interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 135 S.Ct. at 2473 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)) (alterations in original).

Under the Eighth Amendment, which applies to a convicted prisoner, an official's conduct will be found to amount to cruel and unusual punishment "when their 'offending conduct reflects an unnecessary and wanton infliction of pain.'" *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).  In examining an excessive force claim under the Eighth Amendment, the constitutional analysis has both a subjective and an objective component, requiring the court to determine "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and whether "the pain inflicted [is] sufficiently serious." *Cordell*, 759 F.3d at 580 (internal quotation marks and citations omitted) (alteration added).  The heightened Eighth Amendment standard acknowledges that "'[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law.'" *Id*. (quoting *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002)) (alteration in original).

In all instances, "[t]o hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the

17

officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)) (alteration added).  "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475 (alterations added).  If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id*. (alterations added).  To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id*. (quoting *Turner*, 119 F.3d at 429.)  In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id*.

If multiple officers are alleged to have violated Plaintiff's rights, each officer's conduct must be analyzed individually.  "Each defendant's liability must be assessed individually based on his own actions." *Binay*, 601 F.3d at 650 (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).  "A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Morrison v. Bd. of Trustees of Green Twp*., 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002)).

### B.    The Constitutional Right Implicated Here

Plaintiff claims that the officers applied unnecessary and excessive force when they: (1) applied excessively tight handcuffs and refused to loosen them and (2) forcefully escorted Plaintiff,

18

who was handcuffed behind his back, slamming his head into the elevator wall, forcing him to his knees and threatening to taser him, while en route to a basement holding cell in the Lapeer County Courthouse.  With regard to Plaintiff's "legal status" at the time of the alleged acts of excessive force, Defendants asserted in their principal brief that Plaintiff was not an "arrestee" on December 12, 2011, at the time of the alleged acts of excessive force, but rather was an "incarcerated individual," who had been found in contempt by Judge Scott, sentenced and immediately remanded to the custody of the County Sheriff and ordered to pay $866.00 dollars or serve two concurrent 30-day terms in jail.  (ECF No. 20, Defs.' Mot. 1-2, 13.)[2]

Notwithstanding the parties' apparent agreement as to Plaintiff's legal status as a convicted individual who had been sentenced to jail and remanded to the custody of the sheriff for transport to jail, neither party addressed the issue of which constitutional amendment governed the Plaintiff's claims of excessive force.  This Court questioned the parties' mutual assumption that the Fourth Amendment applied and therefore required supplemental briefing on the issue of which constitutional right was implicated by the alleged acts of excessive force in this case.  In his supplemental brief, Plaintiff argued for application of the Fourth Amendment to his claims because Plaintiff had not been "booked" when the alleged acts of excessive force occurred and, according

---

[2]  Plaintiff does not contest these facts, which are otherwise supported by the record.  *See, e.g.*, October 29, 2014 Deposition of Beth Potter-Knowlton, Ex. 1, Dec. 12, 2011 Letter to Lapeer County Sheriff Department.  ("The Defendant, Stephen Hammond, was scheduled for a show cause hearing at the Lapeer County Friend of the Court office at 9:00 am on December 12, 201[1].  The issue of non-payment of child support was taken before Judge Scott for determination.  The Defendant was sentenced to 30 days, concurrent on each of the two (2) files, or payment of $500 on file 1994-01935-DP and $366 on file 1993-01972-DP.").  Following Plaintiff's transport to the Lapeer County Jail following the hearing and sentencing, and following processing at the jail, Plaintiff did pay the $866.00 and was released from custody.  (ECF No. 20, Defs.' Mot. at 8.  *See also* October 29, 2014 Deposition of Theresa Davis at 9-10.).

19

to Plaintiff, the Fourth Amendment applies "through the booking process." ECF No. 31 at 2 (quoting *Burgess*, 735 F.3d at 474). The critical dividing line, however, discussed in *Burgess* and established in *Aldini*, is not the "booking process" but the probable cause hearing. "We find that the Fourth Amendment protects pre-trial detainees arrested without a warrant through the completion of their probable-cause hearings and thus find that the district court erred in applying the Fourteenth Amendment." *Alidini*, 609 F.3d at 859. Until the probable cause hearing occurs, Plaintiff remains a free citizen entitled to the broad constitutional protections of the Fourth Amendment. In this case, Plaintiff was not awaiting a probable cause determination – he was arrested on a warrant issued on a finding of probable cause, arraigned and sentenced before the alleged acts of excessive force occurred. Plaintiff's supplemental brief improperly focused on the "booking process," which of course can occur either before or after a determination of probable cause, rather than the Plaintiff's legal status as a post-probable cause, convicted and sentenced individual.

Defendants argue in their supplemental brief for application of the Fourteenth Amendment, noting that unlike the plaintiff in *Burgess*, Plaintiff in this case was arrested on a warrant, appeared before Judge Scott and was found in contempt of court and immediately remanded to the custody of the jailers. ECF No. 29, 2-3. Defendants conclude that because Judge Scott "had already issued his sentence, the appropriate legal standard is the 14th Amendment." *Id*. at 5. The Fourteenth Amendment applies to pretrial detainees including, as *Aldini* suggests, individuals arrested on a warrant issued on probable cause. *See also Booker v. Gomez*, 745 F.3d 405, 420-21 (10th Cir. 2014) ("[W]e hold the Fourteenth Amendment standard governs excessive force claims arising from post-arrest and pre-conviction treatment if the arrestee has been taken into custody pursuant to a warrant supported by probable cause."). As the Tenth Circuit noted in *Gomez*, when an individual

20

is arrested pursuant to a warrant issued on probable cause, that individual is a pre-trial detainee at the time he is presented for booking. *Id*. at 421.

In this case, following his arrest on a bench warrant and at the arraignment on that warrant, Judge Scott found Plaintiff in contempt of court, ordered him immediately detained and sentenced him to a term of 30 days in jail or a fine of $866:

> THE COURT: The Court finds you in contempt. You haven't been taking your responsibility seriously. On the file of Jennifer Guerrero, 94-019935, the Court is going to order $500.00 or 30 days in jail.
>
> On the file Brandy Lee Hammond versus Stephen Roger Hammond, File 93-019712, the Court is going to order you pay one month's support, $366.00 or 30 days in jail . . . .
>
> MS. POTTER: Your Honor, is he in custody at this time or are you allowing him till the end of the day?
>
> THE COURT: No, he's in custody. He can make a phone call.

ECF No. 29, Defs.' Supp. Br. Ex. 1, Transcript of December 12, 2011 Friend of the Court Bench Warrant Arraignment Before the Honorable Justus C. Scott, Family Court Judge, Lapeer, Michigan 11.

Following the imposition of this sentence, while being escorted to the basement of the courthouse and while awaiting transportation to the jail, Plaintiff claims he was subject to excessive force. A threshold question the Court must address is what was Plaintiff's legal status at that time?

In *Lewis v. Stellingworth*, No. 07-13825, 2009 WL 1384149, at *6 (E.D. Mich. May 14, 2009), a factually analogous case, Judge George Caram Steeh of this District discussed the legal implications of a finding of contempt:

> When exercising its civil contempt power [to coerce compliance with a court order], the court acts as the factfinder, determines whether there was contempt under a preponderance of the evidence standard, and imposes sanctions if this standard is met. If the contemptuous behavior occurs in front of the court, i.e., it is "direct"

21

> contempt, there is no need for a separate hearing before the court imposes any proper sanctions because all facts necessary to a finding of contempt are within the personal knowledge of the judge. . . .

*Lewis*, 2009 WL 1384149, at *6 (quoting *In re Contempt of Auto Club Ins. Association*, 243 Mich. App. 697, 712, 624 N.W.2d 443 (2001)) (alterations in original).  In *Lewis*, Judge Steeh applied the Eighth Amendment to plaintiff's excessive force claim, finding that plaintiff, who was being held pursuant to a contempt sanction for refusing to take a DNA test in a paternity suit, "was not a free citizen after Judge McBain found him in contempt of court and ordered him held in custody at the Jackson County Jail until he submitted to the DNA test," and "was not a suspect or 'pretrial detainee' awaiting an adjudication of charges." 2009 WL 1384149, at *6.

While neither party in this case advocated in their supplemental brief for the Eighth Amendment, the Court finds the argument for application of the Eighth Amendment here compelling.  As in *Lewis*, Plaintiff was not a free citizen, nor was he a was he a pretrial detainee "awaiting an adjudication of charge," *Lewis*, 2009 WL 1384149, at *6, after Judge Scott found Plaintiff in contempt of court and ordered him immediately held in custody.  He was a convicted prisoner in the custody of the sheriff awaiting transport to jail and, as Judge Steeh concluded in *Lewis*, his excessive force claim therefore should be analyzed under the Eighth Amendment:

> Judge McBain found Lewis in "direct" civil contempt, and ordered Lewis jailed to coerce compliance with the court's order to take the DNA test. *See [In re Contempt of Auto Club]* at 712, 712 n. 15, 624 N.W.2d 443. Because Lewis was a prisoner in the custody of the Jackson County Sheriff's Department pursuant to Judge McBain's contempt sanction, "any treatment [Lewis] received on the way to a jail cell is governed by the Eighth Amendment." *Sharp[v. Kelsey]*, 918 F. Supp. [1115] at 1122 [(W.D. Mich. 1996)].  *See also Richman v. Sheahan*, No. 98 C 7350, 2007 WL 489138, *5–*6 (N.D. Ill. Feb.2, 2007) (holding that criminal contemnor was a prisoner when alleged excessive force was applied, and therefore Eighth Amendment standard applied), *aff'd in part*, 512 F.3d 876, 883 (7th Cir. 2008). The Eighth Amendment applies to Lewis' excessive force claims.

22

2009 WL 1384149, at *6 (footnote omitted).

In *Sharp v. Kelsey*, 918 F. Supp. 1115 (W.D. Mich. 1996), a case relied on by Judge Steeh in *Lewis*, then-Chief Judge Richard Enslen applied the Eighth Amendment to plaintiff's excessive force claims where she had been held in contempt and ordered to jail:

> Ms. Sharp was convicted of a crime when Judge Hocking summarily found her guilty of criminal contempt for her contumacious conduct in the courtroom. Criminal contempt is a crime like any other in the sense that it is a violation of the law punishable by fine or imprisonment or both. The Supreme Court holds that a summary adjudication of criminal contempt for conduct occurring before a judge affords the contemner due process. Ms. Sharp passed through the due process clause and on to a conviction and sentence in those few minutes in front of Judge Hocking.
>
> When Judge Hocking summarily convicted Ms. Sharp of criminal contempt in front of Officer Baird and ordered him to take her to jail, this Court holds that Ms. Sharp was thereafter subject to the protections of the Eighth Amendment and not the Fourth or Fourteenth Amendments. At the moment Judge Hocking completed his order with an officer immediately present, any Fourth Amendment seizure was complete because she was not free to go where she pleased. As far as the defendant officers are concerned, Ms. Sharp was never *not* in custody. This Court is not faced with the problem of a convicted person who has escaped custody. Ms. Sharp was not a suspect, detainee, or fugitive; she was a convicted person in the custody of Officer Baird and the Eaton County Sheriff's Department.
>
> Because she was a prisoner in the custody of Officer Baird and the Eaton County Sheriff's Department, any treatment she received on the way to a jail cell is governed by the Eighth Amendment. Claims of excessive force against convicted prisoners should be analyzed under the Eighth Amendment and not the [Fourth or] Fourteenth Amendment.

918 F. Supp. at 1122-23 (internal citations, quotation marks omitted and explanatory phrases omitted) (emphasis in original) (alterations in original). *See also Richman v. Sheahan*, 512 F.3d 876, 881 (7th Cir. 2008) (comparing the constitutional amendment applicable to the "newly convicted defendant" who is gratuitously beaten on route to the jail (presumably the Eighth Amendment) with those of the escaped prisoner who is beaten in the process of being re-seized (possibly the Fourth Amendment)).

In this case, there is no evidence that Plaintiff had escaped the custody of the officers who were escorting him following Judge Scott's finding of contempt and imposition of sentence.  Like the plaintiffs in *Lewis* and *Sharp*, Plaintiff here was "was not a suspect, detainee or fugitive; [he] was a convicted person in the custody of [officers].  Because [he] was a prisoner in the custody of [officers], any treatment [he] received on the way to a jail cell is governed by the Eighth Amendment."  *Sharp*, 918 F. Supp. at 1122 (alterations added).  Plaintiff's claims that he was (1) forcefully driven head first into the wall of the elevator, forced to the floor and threatened with a taser, all while handcuffed behind his back and (2) ignored by officers when he persistently complained of excessively tight handcuffs.  All of these events, which occurred after Judge Scott had imposed a contempt sentence, are appropriately analyzed under the Eighth Amendment.

In examining an excessive force claim under the Eighth Amendment, the constitutional analysis has both a subjective and an objective component, requiring the court to determine "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and whether "the pain inflicted [is] sufficiently serious."  *Cordell*, 759 F.3d at 580 (internal quotation marks and citations omitted) (alteration added).  In determining whether the force used was applied in a good faith effort to restore discipline or rather inflicted for a malicious purpose, it is "proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

"While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred."

24

*Cordell*, 759 F.3d at 581 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). "'When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident.'" *Cordell*, 759 F.3d at 581 (quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)) (alteration in original). *De minmis* uses of physical force are generally excluded from recognition under an Eighth Amendment analysis, "provided the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 10 (quoting *Whitley v. Albers*, 475 U.S. 312, 318–22, (1986)). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." *Id*. at 8. In the end, a determination of what constitutes "unnecessary and unwanton infliction of pain," is "contextual and responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8.

"[A]t this stage in the litigation, we must accept [Plaintiff's] version of events without weighing the evidence or assessing the credibility of prospective witnesses," and Plaintiff cannot be "require[d] to present evidence in addition to his testimony." *Id*. There is no video evidence in this case that would "utterly discredit" Plaintiff's version of events and thus we accept his testimony as true and assume his version of events. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

### 1.     Deputy Cummings

Plaintiff alleges that Cummings forcefully handcuffed him behind his back, escorted Plaintiff down the courthouse hallway by the hood of his sweatshirt, violently shoved Plaintiff into the elevator wall, causing Plaintiff to hit his head, grabbed him by the neck and forced him to the floor of the elevator and placed, but did not deploy, a taser directly on his neck. Plaintiff also alleges that he complained several times to Cummings during the course of these events that his handcuffs were too tight and were hurting him and that Cummings told him they would be "okay" and refused to

25

loosen them.  The injury to Plaintiff's wrists, although not visibly severe, was documented in photographs taken at the jail and confirmed in a subsequent medical examination.  Plaintiff asserts, and we must accept, that throughout this sequence of events, he was not resisting, swearing, yelling, assaulting anyone or trying to flee.

### a.    Level of force employed during escort while Plaintiff was handcuffed.

The constitutional analysis of an Eighth Amendment excessive force claim has both a subjective and an objective component, the subjective component requiring the court to determine "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" and the objective component inquiring whether "the pain inflicted [is] sufficiently serious." *Cordell*, 759 F.3d at 580 (internal quotation marks and citations omitted) (alteration added).

### i.    The subjective component.

Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that a reasonable jury could find that Cummings lacked a good faith basis to forcefully shove a handcuffed, non-resisting, non-violent prisoner face first into the wall of an elevator, shove him down on his knees on the floor of the elevator and place a taser probe directly on his neck, threatening to deploy it.   The Court considers the following factors:

(1) *The need for the application of force*.  This was not a tense, rapidly evolving jail disturbance involving a dangerous criminal.  Plaintiff had been held in contempt for failing to pay child support and was handcuffed behind his back in a courthouse elevator, allegedly not actively resisting officer's commands, when he was slammed into the elevator wall and eventually taken down to his knees.  Using any amount of force on a handcuffed and subdued individual raises

26

concerns.  *See Cordell*, 759 F.3d at 586 (noting that Sixth Circuit cases establish that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable").  Viewing the facts in the light most favorable to the Plaintiff here, there is no evidence that Plaintiff was acting violently or thrashing about such that slamming him headfirst into the wall and forcefully taking him down to his knees and threatening him with a taser were necessary to control him on the elevator ride to the basement of the courthouse.

(2) *The relationship between the need for force and the amount of force used*.  As in *Cordell*, Plaintiff was handcuffed behind his back and was being held by Cummings in the escort position in an uncrowded courthouse hallway and elevator.  As the Sixth Circuit stated in *Cordell*, it is difficult to understand "how a prisoner in such an incapacitated position would present a sufficient threat to justify the extreme us of force that [Plaintiff] accused [Cummings] of using."  759 F.3d at 583.  In *Cordell*, even though the prisoner had admitted turning to try to face the arresting officer, an act that could be perceived as requiring prison officials to use some degree of force to reassert control over the inmate, the Sixth Circuit nonetheless "doubt[ed] that slamming a handcuffed and controlled prisoner headfirst into a concrete wall comports with human decency."  *Id*. at 586.

(3) *The threat reasonably perceived by officials*.  Cummings testified that Plaintiff was not complying with his commands that Plaintiff face the wall and Cummings testified that he feared Plaintiff (who was handcuffed behind his back) would harm Ms. Potter-Knowlton. Cummings' testimony that he was "concerned" about Ms. Potter-Knowlton possibly being harmed is disputed by Plaintiff and not supported by Ms. Potter-Knowlton's testimony, who stated that there was "some pushing" back and forth and eventually Cummings made reference to his taser and Plaintiff ended up on the floor of the elevator.  Ms. Potter-Knowlton testified that although she was not "scared,"

27

indeed she opted to remain on the elevator when the doors opened on the wrong floor, she was "nervous" that one of them might bump into her.  Viewing the facts in the light most favorable to the Plaintiff, the "commotion" sensed by Ms. Potter-Knowlton was caused by Cummings' unnecessarily rough treatment of the Plaintiff, not by Plaintiff's threatening conduct.  Ms. Potter-Knowton also testified that she knew Plaintiff from previous friend of the court matters and had never known him to be violent.  Plaintiff denies that he was uncooperative and resisting and there is no evidence to suggest that Plaintiff had ever threatened Ms. Potter-Knowlton in his past friend of the court dealings with her nor, viewing the facts in the light most favorable to the Plaintiff, evidence that he posed a threat to her that day.

(4) *Efforts made to temper the severity of the force*.  After allegedly shoving the handcuffed Plaintiff's face into the wall, and forcing Plaintiff to the floor of the elevator on his knees, Cummings drew his taser and placed the probes onto Plaintiff's neck to frighten Plaintiff with the threat of further force by electric shock. *See Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995) (recognizing that actions "designed to frighten and degrade" an inmate can amount to an "unwarranted, malicious, and sadistic use of force" in violation of the Eighth Amendment). The record reveals no effort on Cummings' part, who admittedly had Plaintiff down on his knees on the elevator floor completely compliant, to temper the force he was willing to use.

Plaintiff testified that he never resisted getting onto the elevator and that Cummings shoved him into the back of the elevator so hard that his face hit the elevator wall and states that he was turning away from the wall so Cummings wouldn't push his face into the wall, not "spinning around."  Hammond Dep. 36, 39.  Cummings denies that he shoved Plaintiff into the wall at this point and concedes that it would have been excessive force to have done so.  Cummings Dep. 28.

28

Cummings testified that Plaintiff continued to try to turn around and "took a step" toward Mr. Potter-Knowlton. *Id*. at 31. Cummings testified that he then placed a knee in the back of Plaintiff's leg and forced Plaintiff to kneel on the floor. *Id*. at 32. Plaintiff denied stepping toward Ms. Potter-Knowlton and testified that Cummings was trying to "throw him on the floor" and was "pushing on his neck" trying to get him on the floor and Plaintiff kept asking Cummings why he was "throwing [him] around" like this. Hammond Dep. at 20. Plaintiff testified that Cummings had a hold of his neck after shoving him into the wall and that he knelt down on the elevator floor when Cummings asked him to and was fully compliant when Cummings put the taser to the back of Plaintiff's neck and threatened to use it if Plaintiff didn't stay on the floor. *Id*. at 21.

These two irreconcilable versions of events preclude a finding by the Court at this summary judgment stage that Cummings acted solely to maintain discipline and lacked any malicious or sadistic intent in employing force to subdue Plaintiff while escorting him on the elevator to the basement of the courthouse. Cummings insists that Plaintiff was resisting and therefore the amount of force used was reasonable. But this just creates dueling versions of the facts that cannot be resolved by the Court on summary judgment. *See Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (noting that officers claim that plaintiff was resisting arrest created "dueling accounts" about whether the amount of force used may have been reasonable under the circumstances of plaintiff's resistance, rendering the officers ineligible for qualified immunity) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)).

Viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact whether the force employed by Cummings, as alleged by Plaintiff, "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Cummings

was not in midst of quelling a jail disturbance – in fact he was in a courthouse elevator with a handcuffed individual who had been held in contempt for failing to make child support payments, along with a representative of the friend of the court, Ms. Potter-Knowlton, who knew the Plaintiff from prior friend of the court matters and testified that Plaintiff had never been violent and that she had never been threatened by the Plaintiff.  A reasonable juror could conclude that Cummings' conduct in shoving Plaintiff's face into the wall of the elevator, forcing Plaintiff to the floor and threatening to use his taser by pressing it into Plaintiff's neck, all while Plaintiff was handcuffed behind his back,  was not necessary to maintain discipline and was malicious and intended to cause harm.

> ### ii.    The objective component.

"The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency. . . . In the excessive force context, society's expectations are different [than in the context of a conditions of confinement or medical needs case].  When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident."  *Hudson*, 503 U.S. at 9.

In this case, Plaintiff did seek treatment for his claimed injuries and Dr. Smith's report noted "diffuse tenderness to palpation over the spinous process of the cervical, thoracic and lumbar spine as well as tenderness of the spine, abrasions to both wrists, and wrist sprains."  Pl.'s Resp. Ex. J. Plaintiff testified in his deposition that he still has residual back pain from the excessive force applied by Cummings.  Hammond Dep. 26.  As the Sixth Circuit reiterated in *Cordell*, this Court cannot dismiss Plaintiff's characterization of his injuries.  759 F.3d at 587.  If this Court "does

30

accept [Plaintiff's] testimony and allegations as true – that [Cummings] rammed [Plaintiff] headfirst into the wall while he was handcuffed and controlled – a reasonable jury could conclude that [Plaintiff] suffered severe pain that objectively violated our contemporary norms of human dignity." *Cordell*,, 759 F.3d at 587 (alterations added).[3]

### iii.   The right was clearly established.

"Under the Fourteenth, Fourth or Eighth Amendment, assaults on subdued, restrained and nonresisting detainees, arrestees, or convicted prisoners are impermissible."  *Coley,* 2015 WL 4978463, at *6 (citing *Phelps*, 286 F.3d at 301-02).  At the time of the alleged acts of excessive force in this case, "any reasonable official would [have] know[n] that ramming a handcuffed and controlled prisoner headfirst into [an elevator] wall is an unreasonable method of regaining control of a prisoner." *Cordell*, 759 F.3d at 588 (alterations added).  Indeed, Cummings conceded at his deposition that had he pushed the Plaintiff, who was handcuffed behind his back, into the wall of the elevator at the point that Plaintiff claims he was shoved, this would have been an act of excessive force.  Cummings Dep. 28. *See also Johnson v. Perry*, 106 F. App'x 467, 469 (6th Cir. 2004) ("An unprovoked application of force to a handcuffed and shackled prisoner would violate clearly

---

[3]  The injuries suffered by the plaintiff in *Cordell* included a laceration to his face that required 5 stitches.  759 F.3d at 583.  Admittedly, Plaintiff does not claim to have been cut on his face or head when shoved into the elevator wall.  However, the severity of the injury is just one element of the Eighth Amendment claim, and is not dispositive. *Hudson*, *supra*. *See also Gunther v. Castineta*, 561 F. App'x 497, 503 (6th Cir. 2014) (citing *Hudson* and noting that "serious injury" is not a prerequisite for a viable Eighth Amendment claim).  Notably, the Sixth Circuit also credited Cordell's subjective complaints of head and neck pain, which were not contradicted by the medical records. So too here.  It is for a jury, not this Court, to decide if Plaintiff's complaints of resulting and lingering neck and back pain are to be believed and attributed to Cummings' alleged conduct. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.  If the jury finds the subjective component here, it may reasonably find the objective component, even if significant injury is not evident.

established law under the Eighth Amendment.") The right to be free from the excessive force allegedly applied by Cummings in the elevator was clearly established at the time and Cummings is not entitled to qualified immunity.[4]

### b. Excessively tight handcuffs.

Plaintiff claims that Cummings applied his handcuffs too tightly and that Plaintiff immediately complained and was told by Cummings, who according to Plaintiff did not check them for tightness, that they would "be okay." Cummings testified that he did not check the handcuffs for tightness when he first applied them and did not check to see at that time if they had been double locked, which would have prevented the handcuffs from tightening on themselves during the events in the elevator. Plaintiff also claims that he complained at least two other times to Cummings that his handcuffs were too tight and that in both instances Cummings did nothing in response. Plaintiff testifies that Cummings never put a finger in between the handcuffs and Plaintiff's wrist to check for tightness and that a finger would not have fit because the cuffs were too tight. Although Cummings testified that he did check the handcuffs for tightness when he placed Plaintiff in the basement lockup cell and further testified that Plaintiff never complained that the handcuffs were tight, this evidence only serves to create a genuine issue of material fact, which this Court may not resolve in favor of the moving party. *Tolan*, 134 S. Ct. at 1866. This Court must view the facts in a light most favorable to the Plaintiff here, unless those facts are 'blatantly contradicted by the

---

[4] The Court concludes that there is a genuine issue of material fact whether Cummings' conduct, as alleged by Plaintiff, would violate the Eighth Amendment standard, and necessarily would conclude that this claim survived summary judgment under either the Fourth or the Fourteenth Amendment. *See Harris v. City of Circleville*, 583 F.3d 356, 366-67 (6th Cir. 2009) (finding that where the very "legal norms" underlying a claim that an officer used force on a restrained arrestee or detainee are so well established that even if there were "some lingering ambiguity" about which amendment applied, defendants would not be entitled to qualified immunity).

record,' *Scott*, 550 U.S. at 380, or are 'so utterly discredited by the record as to be rendered a visible fiction.'" *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014) (internal quotation marks omitted). There is no such blatant contradiction, *i.e.* the equivalent of video or audio evidence disproving Plaintiff's version of the facts, in this case. Ms. Potter-Knowlton testified that she was not present when Cummings handcuffed Plaintiff and testified that she did not hear Plaintiff complain about the tightness of his handcuffs.[5]

Finally, Plaintiff did provide evidence of the injury he claims he suffered as a result of the excessively tight handcuffs. Plaintiff complained to jail personnel that day about the injury to his wrists from the handcuffs. The photographs taken by Deputy Polmanteer that day demonstrate red marks that Sergeant Davis testified could be consistent with marks left by handcuffs that had been applied too tightly. On December 15, 2011, three days after the handcuffing incident, Plaintiff saw Dr. Albert Smith who diagnosed Plaintiff with multiple contusions with intact skin surface, a wrist sprain, and abrasions of his left and right forearms. (Pl.'s Resp. Ex. H, Medical Notes of December 15, 2011 Visit to Albert Smith Jr., D.O. at 3.)

---

[5] In their Reply brief, Defendants argue that Plaintiff's claim that he was left for 45 minutes in the holding cell with the too-tight handcuffs and all of his personal property still on him is incredible because the deputies would not have left him this long without patting him down for weapons. Cummings and Engelhardt testified that Cummings patted Plaintiff down when he and Engelhardt first placed Plaintiff in the holding cell and before Cummings went back upstairs to complete some paperwork. Engelhardt Dep. 26-27. Engelhardt testified that Cummings was gone 15-20 minutes. Plaintiff testified that he was in handcuffed while sitting in the holding cell for 45 minutes. This discrepancy is presumed resolved in Plaintiff's favor at this summary judgment stage. The evidence is insufficient to "utterly discredit" Plaintiff's version of the facts, which the Court accepts as true at the summary judgment stage. "Any dispute about whose account is right is for the jury." *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (finding that plaintiff's claims that officers refused to loosen his handcuffs and that he suffered a sprained wrist as a result were sufficient to create a question of fact even though officers testified that they did loosen the handcuffs when plaintiff complained).

33

i.      **The subjective component.**

Viewing the facts in the light most favorable to the Plaintiff, the Court concludes that a reasonable juror could find that Cummings lacked a good faith basis to ignore Plaintiff's multiple complaints that his handcuffs were too tight and were causing him pain. The Court considers the following factors:

1. *The need for the application of force.* Cummings had penological justification for placing Plaintiff in handcuffs to escort him down to the basement holding area of the courthouse for transport to the jail.

2. *The relationship between the need for force and the amount of force used.* Plaintiff testified that he immediately complained that the handcuffs were too tight and that Cummings ignored his complaints and never checked, by placing his fingers in between the handcuffs and Plaintiff's wrists, to see if indeed they were too tight. Cummings conceded that he did not check the handcuffs for tightness, or double lock them so that they would not tighten on themselves, until after the elevator ride to the basement when Plaintiff was placed in a holding cell. Cummings testified that Plaintiff never complained that the handcuffs were too tight and never complained of pain. This, of course, is a genuinely disputed fact at this stage of the litigation. There is no evidence that, after placing Plaintiff in the holding cell, Cummings was urgently needed elsewhere, or that security reasons prevented Cummings from responding to Plaintiff's complaints. Indeed, Cummings testified that if Plaintiff had complained, he would have responded and loosened the handcuffs. Thus, while the initial use of the handcuffs was justified, there is no evidence of a penological purpose for ignoring Plaintiff's complaints and failing to loosen them in response to Plaintiff's complaints. Plaintiff testified that he asked Cummings on at least three separate occasions to loosen

34

the cuffs and each time he was ignored.  Plaintiff claims to have suffered injury to his wrists when he was shoved around on the elevator and further aggravated those injuries by being left for at least 45 minutes in the holding cell in his too-tight handcuffs.  Deputy Polmanteer's photographs, and Plaintiff's medical records, support his claim that he suffered injury to his wrists.

3.  *The threat reasonably perceived by officials*.  Viewing the facts in the light most favorable to the Plaintiff, he was not resisting or acting violently at the times that he complained of his handcuffs being too tight and, again crediting Plaintiff's version of the facts, there is no evidence that Plaintiff posed a threat to Cummings or to the security of the courthouse or other court personnel as he was being escorted through the courthouse with his hands cuffed behind his back. In fact, Cummings must not have perceived Plaintiff as posing a threat because he testified that if Plaintiff had complained, he would have loosened his handcuffs.  In any event, accepting Plaintiff's version of events, Plaintiff was never resisting efforts to place him in handcuffs and was cooperating all along with Cummings' requests.  Cummings never suggested that loosening Plaintiff's handcuffs would have presented a security threat.  Indeed, Cummings testified that he did loosen the handcuffs when he first placed Plaintiff in the holding cell in the basement.  Plaintiff disputes this fact and testified that his handcuffs were not adjusted until Cummings returned to the basement some 45 minutes later.  This, of course, is a genuinely disputed fact that is not properly resolved by the Court on summary judgment.

4. *Efforts made to temper the severity of the force*.  Accepting Plaintiff's version of the facts, no efforts were made to temper the severity of the tight handcuffs, which was brought to Cummings' attention on at least three occasions.

Whether or not a jury will accept Plaintiff's version of the facts, this Court must.  Those facts

35

are sufficient to create a genuine dispute as to whether Cummings maliciously or sadistically refused to loosen Plaintiff's handcuffs, despite repeated requests and the opportunity to do so, purely for the purpose of causing Plaintiff to suffer. *See Cromer v. Bauman*, No. 09-220, 2011 WL 4529342 (W.D. Mich. July 25, 2011) (Greeley, MJ), adopted at 2011 WL 45293334 (W.D. Mich. Sept. 29, 2011) (finding a material dispute of fact as to the level of force used and the need for that force on plaintiff's Eighth Amendment claim that jailers ignored his complaints that his handcuffs were too tight and slammed his head into a steel door). *Cf. LaPine v. Caruso*, No. 10-1272, 2012 WL 1034024, at *8 (W.D. Mich. Feb. 13, 2012) (granting officers summary judgment on Eighth Amendment handcuffing claim in light of officer's uncontested testimony that plaintiff never complained that the handcuffs were too tight).

While the heightened Eighth Amendment standard acknowledges in part that maintaining prison security and discipline may, at times, require that inmates be subjected to physical contact approaching assault, *Cordell*, 759 F.3d at 580, such "prison security" was not at issue here to any degree. *Pewitte v. Haycraft*, No. 3-13-0484, 2015 WL 5038026 (M.D. Tenn. Aug. 25, 2015) (finding a genuine issue of material fact as to both the subjective and objective components of prisoner's Eight Amendment claim where plaintiff testified that officers persistently ignored his complaints of pain caused by the tightness of handcuffs, noting that while prison guards have wide-ranging discretion to apply force to maintain security, proof that guards ignored multiple complaints during a controlled transport raised a question whether they left the handcuffs tight in a good faith effort to maintain discipline or with malicious and sadistic intent). *Cf. Adams v. Battaglia*, No. 07-4897, 2011 WL 2038722 (N.D. Ill. May 24, 2011) (rejecting an Eighth Amendment handcuffing claim where prisoners were handcuffed for security reasons during a prison-wide shakedown and

36

several suffered cuts and bruises from excessively tight handcuffs when multiple prison guards ignored complaints that handcuffs were too tight).

> ### ii.  The objective component.

"The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency. . . . In the excessive force context, society's expectations are different [than in the context of a conditions of confinement or medical needs case].  When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident."  *Hudson*, 503 U.S. at 9.

Although Plaintiff's injuries were not severe, they were corroborated – they were documented by photographs and by a physician's examination.  That they were not severe does not bar Plaintiff's claim – the absence of a serious injury does not preclude an Eighth Amendment claim. *Hudson*, 503 U.S. at 7.  *See Ray v. Hogg*, No. 05-73910, 2007 WL 2713902 (E.D. Mich. Sept. 18, 2007) (denying defendants' motion for summary judgment on plaintiff's Eighth Amendment claim where plaintiff testified that his handcuffs were too tight, defendants ignored his complaints of pain, tightened the handcuffs and plaintiff alleged injury as a result, concluding that "[e]ven if Plaintiff's injuries were *de minimis*, reasonable jurors could find from Plaintiff's testimony that Defendants' alleged gratuitous infliction of pain was done maliciously and sadistically to cause harm").  *But see Jones Bey v. Johnson*, 248 F. App'x 675, 677 (6th Cir. 2007) (finding that cuts and bruises resulting from a disciplinary handcuffing were *de minimis*).

In this case, viewing the facts in the light most favorable to the Plaintiff, there were no penological purposes that could have justified Cummings' multiple refusals to check and/or loosen

Plaintiff's handcuffs.   In the somewhat unusual situational context of this case, the typical institutional concerns that drive a greater acceptance for forceful handling of convicted prisoners simply were not in play.   Although Plaintiff's legal status was that of a convicted prisoner, logistically he was in a more controlled environment than that routinely faced by a correctional officer in the institutional setting.   Given this context, a reasonable juror could conclude that the injuries suffered by Plaintiff as a result of Cummings' refusals to alleviate his suffering "violated contemporary standards of decency."

       **iii.**      **The right was clearly established.**

The Court has concluded that on these facts a reasonable juror could concluded that Cummings' violated Plaintiff's constitutional rights, because a reasonable juror could conclude (1) that the force applied through placement of the too-tight handcuffs and subsequent refusals to loosen them was applied not in a good faith effort to maintain discipline but rather for malicious and/or sadistic reasons and (2) that the force resulted in injuries that, in the context of this case, offend common notions of decency.   In the context of handcuffing claims under the Fourth Amendment, the Sixth Circuit has observed that "if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful." *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001).   As the Sixth Circuit observed in *Cordell*, *Hudson* suggests that in the Eighth Amendment context: "'[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated.'" *Cordell*, 759 F.3d at 588 (quoting *Hudson*,  503 U.S. at 9).   Mindful that this Court cannot "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011), the Court

concludes that in the context of this case, which provided every opportunity for an officer to respond to Plaintiff's pleas, a reasonable officer would have known that maliciously choosing to ignore an inmate's multiple requests to loosen his handcuffs for no penological purpose, would offend common notions of decency and would violate the prisoner's Eighth Amendment rights. Accordingly, Cummings is not entitled to qualified immunity.

### 2. Deputy Engelhardt

The sole claim against Deputy Engelhardt is that he failed to respond to Plaintiff's complaint that his handcuffs were too tight.  Plaintiff frames his claim against Engelhardt as a failure to intervene.  To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Burgess*, 735 F.3d at 475  (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it."  *Id.*

Viewing the facts in the light most favorable to the Plaintiff, he told both Engelhardt and Cummings that his handcuffs were too tight when they first placed him in the lock up holding cell and neither officer responded with even a check of the handcuffs.  Plaintiff testified that he again complained while he was in the holding cell, after Cummings left to go back upstairs to complete paperwork, and that Engelhardt ignored his complaints.  Hammond Dep. 37.  Engelhardt denied that Plaintiff complained but testified that if Plaintiff had complained, he would have gone into his cell and taken a visual look of the handcuffs to determine whether they needed to be loosened.

39

Engelhardt Dep. 29. Thus, Engelhardt conceded that he would have had both the opportunity and the means to intervene and loosen the handcuffs had Plaintiff complained. Because we must accept Plaintiff's assertion that he did complain, there is a genuine issue of material fact whether Engelhardt was aware that Plaintiff's handcuffs were too tight when he had the opportunity and the means to address Plaintiff's complaints but did nothing in response to Plaintiff's complaints. For the same reasons that this claim survives summary judgment against Cummings, it also creates a genuine issue of material fact as to Engelhardt who likewise is not entitled to qualified immunity.

### B.    Gross Negligence Against Cummings and Engelhardt

Count III of Plaintiff's Complaint alleges that the Defendants' conduct amounted to "gross negligence" that was the proximate cause of Plaintiff's injuries. Plaintiff's gross negligence claim, based on the same allegations that form the basis for his claim of excessive force, must be dismissed. The Sixth Circuit has clearly held that "gross negligence" is not an independent cause of action for claims based on intentional conduct:

> In Count I of her amended complaint, plaintiff claims that defendants' alleged use of excessive force constituted gross negligence, which is actionable under Mich. Comp. Laws § 691.1407. Although establishing that a governmental official's conduct amounted to "gross negligence" is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available to plaintiff for allegations of this nature would be for assault and battery. *See, e.g., Van Vorous v. Burmeister*, 262 Mich. App. 467, 687 N.W.2d 132, 143 (2004) ("Thus, plaintiff's claim of gross negligence is fully premised on her claim of excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence. Thus, plaintiff did not state a claim on which relief could be granted.") (citations omitted); *see also Livermore*, 476 F.3d at 408 (rejecting gross-negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of battery" where it was based on a shooting that resulted in death). Therefore, the district court erred in not dismissing plaintiff's state-law gross-negligence claim. As a result, we reverse the district court's decision to deny summary judgment on this claim.

40

*Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). *See also Jackson v. City of Highland Park*, No. 15-10678, 2015 WL 3409013, at *2 (E.D. Mich. May 27, 2015) ("As the Sixth Circuit-relying on Michigan Supreme Court precedent-has explained, '[a]lthough establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available for allegations of this nature would be for assault and battery.'" (quoting *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011)); *Van Buren v. Crawford County*, No. 13-14565, 2014 WL 2217016, at *4 (E.D. Mich. May 29, 2014) (citing *Bletz* and dismissing plaintiff's gross negligence claim); *Dizdarevic v. City of Hamtramck*, No. 13-11207, 2014 WL 7896367, at *5 (E.D. Mich. May 21, 2014) (citing *Bletz* and dismissing plaintiff's gross negligence because "a gross negligence claim cannot be maintained as a separate cause of action but is only relevant in determining whether a governmental actor is entitled to immunity for an intentional tort"); *Shirley*, 2013 WL 4666890, at *14 (citing *Bletz* and dismissing plaintiff's gross negligence claim based upon alleged acts of excessive force which, if accepted as true, were intentional acts giving rise only to a claim of assault and battery).

If a jury concludes that Cummings and/or Engelhardt acted maliciously and sadistically in the force they applied to Plaintiff, "such conduct would be considered intentional" and would give rise not to a claim for gross negligence but to a claim for assault and battery. *Jackson*, 2015 WL 3409013, at *3. Accordingly, Plaintiff's gross negligence claim is dismissed.

### C.    Assault and Battery Against Cummings

"'Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.' " *Grawey v. Drury*,

41

567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 685 N.W.2d 657, 661 (2004)). A battery is defined as "'an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'" *Id.*

Plaintiff brings an assault and battery claim against Cummings only and Cummings invokes the defense of governmental immunity. Pl.'s Resp. 18-19. Viewing the facts in the light most favorable to the Plaintiff, Cummings is not entitled to governmental immunity on Plaintiff's claims of assault and battery. "Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity. Michigan governmental immunity 'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (quoting *Odom*, 760 N.W.2d at 228) (finding that district court improperly applied an objective reasonableness test in analyzing plaintiff's assault and battery claim). "That malicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result.'" *Id.* (quoting *Odom*, 760 N.W.2d at 225).

A reasonable juror who accepted Plaintiff's version of the facts could conclude that Cummings maliciously shoved Plaintiff's face into the wall of the elevator, forced him onto the floor and held a taser to his neck, all while he was handcuffed behind his back and riding in a courthouse elevator. Cummings is not entitled to summary judgment on Plaintiff's assault and battery claim.

### D.    Failure to Train Against Lapeer County

A municipality can be held liable under § 1983 where it is shown that a municipal custom or policy is the driving force behind the alleged constitutional violation. *See Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 694 (1978) (stating that the drafters of § 1983 intended only to impose liability

on a government that "causes" an employee to violate another's rights under color of some official

policy). "A municipality or county cannot be liable under § 1983 absent an underlying

constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th

Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). To prevail in such a suit,

the plaintiff must show that the alleged violation of his federal rights was caused by a municipal

policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff

asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect

the policy to the municipality, and show that the specific injury at issue was caused by the execution

of that policy. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The causal link

must be strong enough to support a finding that the defendants' deliberate conduct can be deemed

the "moving force" behind the violation. *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353,

362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an

illegal policy or custom. 398 F.3d at 429. The plaintiff can point to (1) the government's legislative

enactments or official policies; (2) actions by officials with final decision-making authority; (3) a

policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation

of federal rights by its officers or agents. *Id.* Thus, to state a claim against Lapeer County, Plaintiff

must identify official policies, actions of officials with final decision-making authority, a policy of

inadequate training or supervision, or a custom or practice of tolerating the violation of federal

rights. Where no formal written policy exists, the critical inquiry is whether there is a policy or

custom that although not explicitly authorized "is so permanent and well settled as to constitute a

43

custom or usage with the force of law." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).   A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

If seeking to hold a municipality liable on a failure to train theory, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). *See also Burgess*, 735 F.3d at 478-79 (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Miller*, *supra*) (alteration in original); *Hearon v. City of Ferndale*, No. 11-14481, 2013 WL 823233, at *16 (E.D. Mich. March 6, 2013) (finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional

44

conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

Plaintiff explains in his response that, after conducting discovery, Plaintiff is only pursuing a policy claim against Lapeer County for its failure to train and supervise as it relates to Plaintiff's claim of excessive force. Pl.'s Resp. 22. This claim fails. Plaintiff offers no evidence in this case that the County was on notice of a pattern of prior instances of unconstitutional excessive force demonstrating that the City had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and substantially certain to cause injury. Plaintiff asserts that Cummings and Engelhardt were "clearly inadequately trained" on the use of force, citing to their testimony that they did not specifically recall their training on the use of excessive force. Pl.'s Resp. 21. Both, however, testified to an awareness of the proper use of force, specifically how to properly check handcuffs for tightness, and Defendants' Reply attached documentation evidencing both the County's policies on the use of force, specifically handcuffing, and Cummings' and Engelhardt's personnel records that reflect that they did in fact receiving training on the use of force.

Even assuming, however, that both Cummings and Engelhardt lacked proper training, this is not sufficient to state a policy claim for failure to train against the County. "Evidence that a particular officer was unsatisfactorily or even negligently trained will not suffice to attach liability

45

to a municipality unless the failure to train is shown to have been the product of deliberate indifference." *Harvey v. Campbell County, Tennessee*, 453 F. App'x 557, 567 (6th Cir. 2011) (citing *City of Canton, Ohio*, 489 U.S. 378, 388-89 (1989)) (holding that where it was undisputed that officer had received *some* training in the use of force, plaintiffs had to show that the county policymakers were on notice, by virtue of a pattern of prior instances that occurred and were ignored, that a failure of further training in this area was substantially certain to result in a constitutional violation). It is uncontradicted that Lapeer County did have a policy regarding the use of force and that the officers did receive *some* training on that policy. Plaintiff presents no evidence here of a pattern of instances in which the County was made aware of the failure of its excessive force policy and was deliberately indifferent to that failure such that future unconstitutional conduct of its officers was substantially certain to occur. Accordingly, Lapeer County is entitled to summary judgment on Plaintiff's failure to train claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants Cummings and Engelhardt's motion for summary on Plaintiff's excessive force (Count I) and assault and battery (Count II) claims, GRANTS Defendants Cummings and Engelhardt's motion for summary judgment on Plaintiff's gross negligence claim (Count III) and GRANTS Lapeer County's motion for summary judgment (Count IV) and DISMISSES the County from this action WITH PREJUDICE.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 25, 2015

46

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 25, 2015.

s/Deborah Tofil_____

Case Manager